# In the United States Court of Federal Claims

No. 19-503
(Filed Under Seal: April 2, 2026)[*]
(Reissued April 23, 2026)

```
* * * * * * * * * * * * * * * * * * *
                                    *
TRENTON GOODWIN,                    *
                                    *
                                    *
              Petitioner,           *
                                    *
       v.                           *
                                    *
SECRETARY OF HEALTH                 *
AND HUMAN SERVICES,                 *
                                    *
              Respondent.           *
                                    *
* * * * * * * * * * * * * * * * * * *
```

*Kirk Otto*, Attorney, Siri & Glimstad LLP, of Richmond, VA, for Petitioner.

*Lauren Kells*, Trial Attorney, Torts Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Respondent.

## OPINION AND ORDER

**SOMERS**, Judge.

Before the Court is a motion for review of the special master's decision denying compensation under the National Vaccine Injury Compensation Program ("Vaccine Act"), 42 U.S.C. §§ 300aa-10–300aa-34, to Petitioner, Trenton Goodwin, *see* ECF No. 184. In his motion for review, Petitioner contends that the special master erred in denying his claim that the human papillomavirus ("HPV") vaccine caused him to develop acute transverse myelitis. In denying Petitioner's claim for a second time, the special master concluded that: (1) Petitioner failed to present a reliable medical theory evincing that the HPV vaccine can cause transverse myelitis; (2) Petitioner lacked preponderant evidence that he developed an antibody essential to his expert's theory of causation; and (3) Petitioner's late onset of symptoms was outside the period for which an inference of causation is appropriate. Petitioner now seeks review of that decision.

---

[*] On April 2, 2026, the Court issued this opinion and order under seal in accordance with Rule 18(b) of the Vaccine Rules (Appendix B) of the Rules of the U.S. Court of Federal Claims. The Court provided the parties 14 days to propose redactions. The parties did not propose any redactions; accordingly, the Court reissues this opinion in its original form with a few minor stylistic and typographical corrections.

For the reasons provided below, the Court finds that Petitioner has not met the high burden imposed under the Vaccine Act to set aside a special master's decision and, therefore, denies Petitioner's motion for review.

**BACKGROUND**

The factual background of this case is largely contained in the special master's ruling after remand. *See generally Goodwin v. Sec'y of Health & Hum. Servs.*, No. 19-503V, 2025 WL 3905158 (Fed. Cl. Spec. Mstr. Oct. 7, 2025) ("Second Entitlement Decision"). In that decision, the special master denied Petitioner compensation for a second time under the Vaccine Act for an injury allegedly caused by the HPV vaccine. *See id.* at *1. Accordingly, the Court outlines only the events and evidence relevant to the motion for review before it.

On March 22, 2018, Petitioner, then a minor, received an HPV vaccination as part of a child wellness visit. ECF No. 1 ¶ 3. On May 30, 2018, 68 days later,[1] Petitioner was hospitalized after exhibiting assorted neurological symptoms, including numbness, weakness, and nausea; difficulty with balance and coordination; the inability to bear weight on both legs or stand unassisted; and an ataxic gait. *Id.* ¶¶ 6–8. Subsequent magnetic resonance imaging ("MRI") resulted in a diagnosis of transverse myelitis, a diagnosis the neurologists for both parties have stipulated is correct. *Id.* ¶ 8; ECF No. 27-1 at 5; ECF No. 31-1 at 5.

On April 4, 2019, Petitioner's mother initiated this action under the Vaccine Act, alleging that the HPV vaccination caused Petitioner's transverse myelitis. *See generally* ECF No. 1. The parties submitted their initial expert reports and were thereafter ordered to provide additional briefing on "onset"—the third prong of the test set forth in *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274 (Fed. Cir. 2005). *See* ECF No. 58 at 1–2. After briefing and without oral argument, the special master held in his first entitlement decision that Petitioner "failed to show the latency between the vaccination and the onset of his transverse myelitis is compatible with a finding that the vaccination caused the transverse myelitis." *Goodwin v. Sec'y of Health & Hum. Servs.*, No. 19-503V, 2024 WL 2033563, at *1 (Fed. Cl. Spec. Mstr. Apr. 16, 2024) ("First Entitlement Decision"). In other words, under *Althen* prong three, the special master denied Petitioner compensation due to the lapse of time between the administration of the vaccine and the injury.

On May 16, 2024, Petitioner filed a motion for review of the special master's decision, alleging that the special master applied incorrect legal standards and erred in his analysis of expert reports. *See* ECF No. 72 at 1. After holding oral argument on Petitioner's motion, *see* ECF No. 80, the Court issued an order and opinion vacating and remanding the special master's first entitlement decision for further proceedings, *Goodwin v. Sec'y of Health & Hum. Servs.*, No. 19-503, 2024 WL 4758470, at *1 (Fed. Cl. Oct. 10, 2024) ("Remand Opinion"). In its opinion,

---

[1] The special master notes in his Second Entitlement Decision that although some of the earlier briefing refers to the onset as 69 days post-vaccination, the parties have since referenced onset as 68 days post-vaccination. *See* Second Entitlement Decision at *3 n.7. The Court adopts the 68-day interval, recognizing that slight variations may arise depending on how the days are counted.

2

the Court explained that although the special master may have ultimately reached the correct decision under *Althen* prong three, "the Court simply [could not] sustain the result based on the reasoning given" and "must remand this matter to the special master so that he [could] articulate a basis for his decision."  Remand Opinion at *6.

Following remand, the parties and the special master devoted significant resources to further proceedings, including, *inter alia*, additional briefing, expert reports, and medical records; numerous status conferences and status reports; a multi-day hearing; and post-hearing briefing.  *See generally* ECF Nos. 83–181.  On October 7, 2025, the special master issued a second entitlement decision, once again denying Petitioner compensation but resting this latest decision on all three *Althen* prongs.  *See* Second Entitlement Decision at *1.[2]  Before the Court is Petitioner's second motion for review, in which Petitioner challenges anew the special master's denial of compensation.

## DISCUSSION

### A.    Legal Standard

### 1.    Standard of Review of a Special Master's Decision

The Vaccine Act grants petitioners a statutory right to seek compensation for injuries caused by the administration of a covered vaccine.  *See* 42 U.S.C. § 300aa-10(a).  Under the Act, judges of this Court review the decisions of special masters upon a petitioner's filing of a motion for review.  *Id.* § 300aa-12(e)(1).  In reviewing the decision of a special master, the Court may:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

*Id.* § 300aa-12(e)(2).  In other words, "[u]nder the Vaccine Act, the Court of Federal Claims reviews [a special master's] decision to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'"  *Markovich v. Sec'y of Health & Hum. Servs.*, 477 F.3d 1353, 1355–56 (Fed. Cir. 2007) (quoting 42 U.S.C. § 300aa-12(e)(2)(B)).  This standard mirrors the standard of review prescribed in the Administrative Procedure Act, *compare* 42 U.S.C. § 300aa-12(e)(2)(B), *with* 5 U.S.C. § 706(2)(A), and is applied using general

---

[2] The Court notes that if the special master believed that his analysis of *Althen* prong three in his first entitlement decision was correct—as his second, much lengthier opinion suggests—there was no need to reopen the case and reinvolve the parties.  The special master could have simply explained his reasoning on prong three using the record already before him.

administrative law principles, *see, e.g.*, *Hines ex rel. Sevier v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1527–28 (Fed. Cir. 1991) (applying several Supreme Court and federal appellate court administrative law decisions in reviewing the decision of a special master under the Vaccine Act).

The Federal Circuit has noted that each of these standards "vary in application as well as degree of deference." *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992). Findings of fact are reviewed under the "arbitrary and capricious" standard. A decision is arbitrary and capricious if it fails to consider relevant evidence, rests on impermissible factors, lacks a rational explanation connecting the facts to the result, or reflects a clear error of judgment. *Hines*, 940 F.2d at 1527–28 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). This is a highly deferential standard, and reversal is unwarranted if a special master "has considered the relevant evidence of record, drawn plausible inferences[,] and articulated a rational basis for the decision." *Id.* at 1528. Discretionary rulings are reviewed under the "abuse of discretion" standard. *Munn*, 970 F.2d at 870 n.10. A special master abuses his discretion when he exercises judgment in a manner that falls outside a "finite range of discretion (e.g. to select a penalty, or to award a specific sum as damages, from within a range of permissible alternatives)." *Hines*, 940 F.2d at 1527. However, this standard is rarely invoked in Vaccine Act review and most often arises in discretionary evidentiary decisions, such as the exclusion of evidence. *See Munn*, 970 F.2d at 870 n.10. Finally, legal conclusions are reviewed under the "not in accordance with law" standard. *Id.* A decision is "not in accordance with law" if a special master misinterprets or misapplies the governing legal standard, such as by misapplying the burden of proof or otherwise committing legal error. *See Doe 93 v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 553, 566 (2011) (citing *Althen*, 418 F.3d at 1277). This aspect of review is implicated only in cases in which a genuine legal issue is presented, rather than a dispute over factual findings. *See Hines*, 940 F.2d at 1527 ("The 'not in accordance with law' aspect of the standard of review is not really involved here, there being no dispute over statutory construction or other legal issues.").

The Court's standard of review in Vaccine Act cases is "uniquely deferential." *Milik v. Sec'y of Health & Hum. Servs.*, 822 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993)). The Court does not "reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011). Provided that a special master's conclusions are "based on evidence in the record that was not wholly implausible," the Court is "compelled to uphold that finding as not being arbitrary or capricious." *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1363 (Fed. Cir. 2000). That is to say, the Court is simply tasked with assessing "whether the [s]pecial [m]aster examined the 'relevant data' and articulated a 'satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Dixon v. Sec'y of Health & Hum. Servs.*, 61 Fed. Cl. 1, 8 (2004) (quoting *State Farm*, 463 U.S. at 43).

### 2.    Petitioner's Burden Under the Vaccine Act

Under the Vaccine Act, a petitioner is required to prove that a vaccine caused the injury alleged. *Althen*, 418 F.3d at 1278. Because the asserted injury—transverse myelitis allegedly caused by the HPV vaccine—is an off-Table injury, Petitioner bears the burden of proving causation-in-fact by a preponderance of the evidence under the three-prong *Althen* test, requiring: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.*

The first *Althen* prong requires a petitioner to provide a plausible medical theory causally connecting the vaccination to the injury. *Id.* While the medical theory need not "rise to the level of scientific certainty" and a petitioner need not provide "detailed medical and scientific exposition on the biological mechanisms," a petitioner's medical theory must provide a "reputable medical explanation for the relationship." *Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1120–21 (Fed. Cir. 2025); *Knudsen ex rel. Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994). Under the second *Althen* prong, a petitioner must "establish[] a logical sequence of cause and effect . . . by a preponderance of the evidence." *See, e.g., Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1327 (Fed. Cir. 2006). Accordingly, prong two requires a petitioner to prove that, as explained by his or her general medical theory under prong one, the vaccine was the cause-in-fact of the injury at issue. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1345 (Fed. Cir. 2010) ("Because causation is relative to the injury, a petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case . . . ."). The Federal Circuit has made clear that temporal association alone is not enough to satisfy causation-in-fact. *Althen*, 418 F.3d at 1278 ("[N]either a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation."). The third *Althen* prong, however, separately requires a petitioner to prove a "medically-acceptable temporal relationship between the vaccination and the onset of the alleged injury." *Id.* at 1281. Specifically, a petitioner must present evidence that symptom onset occurred within a timeframe medically consistent with causation, which must align with the petitioner's proposed causal theory under *Althen*'s first prong. *See de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008) ("[T]he proximate temporal relationship prong requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact.").

### B.    Analysis

In order to overturn the special master's decision, Petitioner is required to demonstrate that the special master's findings on all three *Althen* prongs should be set aside as arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Because it is obvious that Petitioner did not satisfy his burden as to *Althen* prongs two and three, the Court only addresses these prongs in sustaining the special master's decision.

1.    *Althen* Prong Two

With regard to *Althen* prong two, Petitioner argues that the special master "erred by applying incorrect legal standards in analyzing Petitioner's proof of a logical sequence of cause and effect[] linking the HPV vaccination to his transverse myelitis . . . ." ECF No. 185 at 12.  In support, Petitioner raises two points.  First, Petitioner alleges that the special master's prong two analysis is merely a "practical conclusion" of his analysis of prongs one and three and thereby lacks independent analysis of its own.  *See id.*  Thus, according to Petitioner, the "legal errors and abuse of discretion" that plague prongs one and three also infect prong two and, therefore, mandate remand.  *See id.* at 13.  Second, Petitioner "[b]riefly" argues that the special master seemed to "require certainty regarding Petitioner's proposed biological mechanism, MOG protein, in violation of the legal burden."  *Id.* at 13–14.  For the reasons discussed below, neither of these points effectively challenge the special master's findings under the applicable standard of review.

a.    **Petitioner is incorrect in arguing that the special master's *Althen* prong two analysis lacks independent basis.**

Petitioner first asserts that even though the special master's analysis under *Althen* prong two was not itself directly in error, it was nonetheless erroneous because it was "directly tied to his conclusion on *Althen* prongs one and three."  *Id.* at 12.  Although minimally developed, the thrust of Petitioner's argument is that the special master's finding that prong two was not satisfied was solely due to the special master's findings against him on prongs one and three.  It appears that Petitioner landed on this argument through a selective reading of the first two sentences of the special master's prong two analysis.  Petitioner's reading, however, ignores the fact that the special master did indeed evaluate the merits of prong two independently of prongs one and three:

> The final element of petitioner's causation-in-fact claim is the "logical sequence of cause and effect."  Given that Mr. Goodwin has established neither a theory nor appropriate timing, it follows as a matter of logic that he cannot establish a logical sequence of cause and effect, linking the HPV vaccination to his transverse myelitis.  *Nevertheless, if simply for the sake of completeness, this aspect is also evaluated.*

Second Entitlement Decision at *34 (emphasis added) (citation omitted).

Following this introductory paragraph, the special master fully analyzed prong two by addressing "the views of treating doctors, the (lack of) evidence for the MOG antibody, and the potential presence of an alternative cause."  *Id.* (citing *Capizzano*, 440 F.3d at 1326).  Moreover, the special master carefully considered the opinions of Petitioner's treating physicians, who found that "that the vaccine was not likely to be the cause of the transverse myelitis."  *Id.* at *35.  Furthermore, the special master even weighed—and found unpersuasive—the government's argument that "a herpes virus caused [Petitioner's] transverse myelitis."  *See id.* at *37–38 ("This lack of persuasiveness regarding a potential alternative cause does not affect the outcome of [Petitioner's] claim . . . .  The fact that neither the HPV vaccine nor the herpes infection has been

6

persuasively shown to have caused [Petitioner's] transverse myelitis simply means that something else caused it." (citation omitted)).  What is more, as discussed below in more detail, the special master thoroughly analyzed Petitioner's evidence linking Petitioner's general theory of causation to his specific case.  *See id.* at \*35 ("Here, Dr. Steinman's theory is that the HPV vaccine caused an attack on MOG.  Thus, it is 'logical' for there to be some evidence that [Petitioner] developed anti-MOG antibodies." (citations omitted)).

In short, Petitioner's assertion that the special master failed to evaluate *Althen* prong two independently of prongs one and three is simply incorrect.  Indeed, as illustrated by the discussion that follows, Petitioner implicitly acknowledges that the special master assessed prong two by challenging part of that assessment.  Notably, however, Petitioner appears to dispute only the special master's findings on anti-MOG antibody testing, which the Court turns to next.

> **b.      Petitioner's challenges to the special master's findings on anti-MOG antibody testing lack support.**

After incorrectly asserting that the special master failed to independently evaluate *Althen* prong two, Petitioner spends one paragraph of his motion for review challenging the special master's findings on anti-MOG antibody testing on two grounds.  First, Petitioner disputes the special master's holding that "there is not preponderant evidence that [Petitioner] developed anti-MOG antibodies."  ECF No. 185 at 13 (quoting Second Entitlement Decision at \*36).  Second, Petitioner alleges that the special master "require[d] certainty regarding Petitioner's proposed biological mechanism, MOG protein, in violation of the legal burden."  *Id.* at 14.  Petitioner's argument on these two points is exceedingly brief and is not framed to meet the APA standard applicable here.  *See id.* at 12–14 (failing to invoke the terms "arbitrary and capricious" or "abuse of discretion" throughout Petitioner's argument regarding prong two in his motion for review).  At best, Petitioner seems to allege that the special master's findings are contrary to law.  With this shortcoming in mind—and mindful that the Court may only overturn the special master's decision if the APA standard is satisfied—the Court addresses each of Petitioner's arguments.

> i.      *The special master agreed with Petitioner on the very point that Petitioner*
> *now challenges.*

First, Petitioner argues that the special master erred in concluding that there was not "preponderant evidence that [Petitioner] developed anti-MOG antibodies."  *Id.* at 13 (quoting Second Entitlement Decision at \*36).  Petitioner posits that a "more accurate conclusion" would be that "we *cannot know* whether [Petitioner] developed anti-MOG antibodies, because by the time he was tested, even if originally positive, more likely than not he would have tested negative."  *Id.* (emphasis added).  In support, Petitioner urges that the special master should have acknowledged that "[t]he medical literature consistently supports the proposition that more than likely, after 18 months, a patient with monophasic transverse myelitis who originally had MOG antibodies would test negative."  *Id.*  (citing ECF No. 176 at 1–6).  However, on this point, the special master *agrees* with Petitioner:

Collectively and generally, the articles stand for the proposition that MOG antibodies sometimes remain for as long as approximately 18 months after the onset of the disease and sometimes MOG antibodies do not persist that long. An interpretation that is favorable to Mr. Goodwin's case is that the articles do not make the scenario in which (a) Mr. Goodwin was positive for MOG antibodies in June 2018 yet (b) Mr. Goodwin was negative for MOG antibodies in December 2019 absolutely impossible.

Second Entitlement Decision at *36. Thus, Petitioner challenges a finding that the special master resolved in his favor (at least for purposes of deciding Petitioner's case). This posture is paradoxical for a party seeking review under the APA standard applicable here: it is difficult to imagine how a decision can be "arbitrary and capricious," an "abuse of discretion," or "otherwise not in accordance with law" where the decision adopts the very position advanced by the party challenging the decision.

Even if Petitioner could truly challenge this point, he fails to address the special master's *other* finding—namely, that an absence of evidence does not carry the burden of proof. In his analysis, the special master proceeded on the assumption that Petitioner's evidence "neutralized" any adverse inference arising from Petitioner's negative MOG antibody testing results from 2019. *See id.* However, the special master rightly concluded that a lack of contrary evidence is not a substitute for a preponderant showing: "At best[,] . . . there is no reliable evidence about [Petitioner's] status in June 2018.[3] But [Petitioner] bears the burden of proving his case. A finding that the evidence is in equipoise or a finding that there is no relevant evidence means that the party with the burden of proof loses." *Id.* (citing *In re Claims for Vaccine Injs. Resulting in Autism Spectrum Disorder or a Similar Neurodevelopmental Disorder*, 2004 WL 1660351, at *8 (Fed. Cl. Spec. Mstr. July 16, 2004) ("[A] factfinder in a legal case can *always* rule on a factual issue no matter how scanty the evidence, even in the absence of *any* evidence. That is, in legal factfinding, if there is no evidence, the factual issue simply is resolved against the party having the 'burden of proof.'" (emphasis in original)).

Simply put, Petitioner challenged a determination that the special master resolved in his favor: the special master agreed with Petitioner that the negative MOG antibody results in December 2019 do not prove that Petitioner lacked MOG antibodies in June 2018. However, even accepting that the negative testing was not dispositive, Petitioner remained obligated to establish that *Althen* prong two was met by a preponderance of the evidence—a requirement Petitioner now characterizes as a heightened burden.

### ii. The special master did not impose a heightened legal burden.

Petitioner's second challenge to the special master's findings on anti-MOG antibody testing alleges that a heightened burden of proof was imposed in his *Althen* prong two analysis.

---

[3] While the special master refers to Petitioner's status in June 2018 here, other portions of the opinion indicate that the anti-MOG antibody testing at issue was ordered after a pediatric neurology consultation on July 13, 2018. Second Entitlement Decision at *4. Regardless, the results for this testing do not appear in the medical record. *Id.*

In essence, Petitioner's short and largely undeveloped argument is as follows: (1) Petitioner proposed a biologically plausible mechanism under *Althen* prong one (HPV vaccine-triggered antibodies attacking MOG proteins); (2) although Petitioner tested negative for these antibodies months after onset, the negative test results are not proof that antibodies were not present at the time of symptom onset; *therefore*, (3) in concluding that Petitioner lacked preponderant evidence of such antibodies, the special master "require[d] certainty regarding Petitioner's proposed biological mechanism, MOG protein, in violation of the legal burden." ECF No. 185 at 10, 13–14.

If this reasoning appears difficult to reconcile, the difficulty lies in the argument itself—Petitioner appears to conflate the burdens imposed by *Althen* prongs one and two. *Althen* prong one requires Petitioner to make a preponderant showing of a plausible biological mechanism ("a medical theory causally connecting the vaccination and the injury"), while *Althen* prong two requires a *separate*, preponderant showing that the mechanism occurred in this case ("a logical sequence of cause and effect showing that the vaccination was the reason for the injury"). 418 F.3d at 1278; *see also Cerrone*, 146 F.4th at 1121 ("[*Althen* prong two] requires the petitioner to prove, by a preponderance of the evidence, that the medical theory was in fact the mechanism that resulted in the injury at issue."). As the Federal Circuit has explained,

> The second prong of the *Althen* [ ] test is not without meaning . . . .  A claimant could satisfy the first and third prongs without satisfying the second prong when medical records and medical opinions do not suggest that the vaccine caused the injury, or where the probability of coincidence or another cause prevents the claimant from proving that the vaccine caused the injury by preponderant evidence.

*Capizzano*, 440 F.3d at 1327 (citing 42 U.S.C. § 300aa-13(a)(1)(B)); *see also Henkel v. Sec'y of Health & Hum. Servs.*, 165 Fed. Cl. 153, 158–59 (2023), *aff'd*, No. 2023-1894, 2024 WL 3873569 (Fed. Cir. Aug. 20, 2024) ("While evidence used to satisfy one prong of the Althen test may overlap to satisfy another prong, a petitioner does not necessarily meet its evidentiary burden for one prong by virtue of providing preponderant evidence for another prong.  The *Althen* prongs are independent obligations, all of which a successful claimant must satisfy." (citing *Capizzano*, 440 F.3d at 1326–27)); *Sheller Est. of Sheller v. Sec'y of Health & Hum. Servs.*, No. 18-696V, 2022 WL 4075946, at *15 (Fed. Cl. Spec. Mstr. Aug. 15, 2022) ("[T]he parties' briefing seems to suggest that if [there was] a reasonable basis for asserting that childhood vaccines can cause an infant's death, then [there] must automatically also [be] a reasonable basis for asserting that [the petitioner's] death was caused by a vaccination.  However, . . . a persuasive (or reasonable) case regarding *Althen* prong one does not necessarily establish a persuasive (or reasonable) case regarding *Althen* prong two.").

In short, the special master did not impose a heightened legal burden by evaluating whether Petitioner made a sufficient legal showing under *Althen* prong two.  Presenting a biological process for how the HPV vaccination could cause transverse myelitis through an autoimmune attack on MOG proteins was not enough.  Petitioner was required to establish, by a preponderance of the evidence, that this general theory of causation applied to his specific case—a burden that the special master found he failed to carry and that Petitioner does not seriously challenge in his motion for review.

       *iii.    The special master's analysis of Althen prong two was not arbitrary, capricious, an abuse of discretion, or contrary to law.*

Having established that the special master did not impose a heightened burden, the Court now turns to any remaining challenges Petitioner may have to the special master's analysis of Petitioner's prong two arguments. Again, to prevail on a motion for review, Petitioner must do more than disagree with the special master's unfavorable conclusions. As explained below, Petitioner fails to meet this burden.

To start (and to reiterate), Petitioner's arguments under prong two are not framed in terms of the APA standard that must be met here. As mentioned previously, Petitioner does not even invoke the terms "arbitrary and capricious" or "abuse of discretion" in presenting his third point, and any contention that the special master acted contrary to law by "violat[ing] the legal burden" has already been rejected. *See* ECF No. 185 at 12–14. In any event, even if the Court were to construe Petitioner's argument as asserting a violation of the APA standard, the special master's reasoning reflects a rational evaluation of the record and rests on evidence that was "not wholly implausible." *Lampe*, 219 F.3d at 1363.

Because Petitioner posited a theory of molecular mimicry that relied on MOG antibodies, the special master found it "'logical' for there to be some evidence that [Petitioner] developed anti-MOG antibodies." Second Entitlement Decision at *35. In his analysis, the special master appropriately considered "[e]vidence about how a vaccinee did (and did not) respond [to a vaccine]." *See id.* (listing cases). The special master's reasoning is supported by case law confirming that it is not error for a special master to note the absence of evidence of a biological marker associated with the proposed causal mechanism. *See id.* (citing *Howard v. United States*, No. 16-1592, 2023 WL 4117370, at *7 (Fed. Cl. 2023); *Yalacki v. Sec'y of Health & Hum. Servs.*, 146 Fed. Cl. 80, 93–94 (2019); *Copenhaver v. Sec'y of Health & Hum. Servs.*, 129 Fed. Cl, 176, 182–83 (2016); *Cedillo v. Sec'y of Health & Hum. Servs.*, 89 Fed. Cl. 158, 181 (2009)). Moreover, it is supported by authority holding that it *is* error to assume the presence of a biological marker without preponderant evidence. *See id.* (citing *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1362–63 (Fed. Cir. 2019)).

Notably, the special master also references a case in which the testimony of Dr. Steinman—Petitioner's expert in this case—advanced a theory that assumed the presence of a biological marker without proof and, therefore, failed to establish causation by a preponderance of the evidence. *See id.*; *L.R. v. Sec'y of Health & Hum. Servs.*, No. 16-922V, 2024 WL 1912575, at *22 (Fed. Cl. Spec. Mstr. Mar. 28, 2024) ("Similarly, the existence of NMDAR antibodies at the time of [the petitioner's] vaccination must be assumed in order for Petitioner to prevail. The lack of any evidence on this point prevents me from doing so."); *see also Henkel*, 165 Fed. Cl. at 159 (finding Dr. Steinman's "abductive reasoning" insufficient, as he may not "simply state [the petitioner's] injury is presumed evidence of the recall, the recall is presumed evidence of the autoimmunity, and the autoimmunity is presumed evidence of vaccine causation, without some support that these processes actually occurred in [the petitioner's] case. Dr. Steinman's conclusions are, by his own concession, speculation . . . .").

Guided by this authority, the special master ultimately concluded that "[w]hen a petitioner proposes the vaccine leads to the production of certain antibodies, whether those antibodies were detected in the petitioner is a relevant consideration . . . . [I]n [Petitioner's] case, his evidence is lacking.  He has not persuasively shown that he developed anti-MOG antibodies as the theory from Dr. Steinman predicts."  Second Entitlement Decision at *37.  Given the thoroughness of the analysis on this point, the special master's holding reflects a reasoned evaluation of the record, and Petitioner has not persuaded the Court that the decision was arbitrary, capricious, or an abuse of discretion.

Nor has Petitioner convinced the Court that the special master improperly disregarded evidence supporting prong two causation.  In fact, Petitioner presents nothing to support his assertion that the mechanism that he argues *can* cause transverse myelitis *did* cause his transverse myelitis.  Even in the absence of evidence of anti-MOG antibodies, Petitioner still could have offered an explanation as to why the anti-MOG antibody theory applies to his case.  For example, Petitioner could have argued that because his treating physicians ordered MOG antibody tests at the hospital, it was their opinion that Petitioner had MOG antibodies—thus linking his general theory of causation to his specific case.  *See Legault v. Sec'y of Health & Hum. Servs.*, 177 Fed. Cl. 634, 646–47 (2025) ("Special Masters should consider the opinions of treating physicians when making a determination as to *Althen* prong two." (citing *Capizzano*, 440 F.3d at 1326; *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993))).  In fact, Petitioner even appears to raise this argument for the first time at oral argument.  ECF No. 193 at 50:17–23 ("[H]e wouldn't [test for anti-MOG antibodies] unless he thought that that was what was going on.  He didn't test him for leukemia or something, right.  So he is trying to get to the bottom of it based on what he thinks maybe happened.  So even though it was later on and the testing wouldn't be reliable, he still decided to do that testing because in his mind, MOG was a likely idea.").  But oral argument on a motion for review was not the proper time for Petitioner to raise new arguments supporting causation under *Althen* prong two.  Such arguments needed to be raised before the special master.

In sum, Petitioner needed to show that the special master's decision on *Althen* prong two was arbitrary, capricious, an abuse of discretion, or contrary to law.  Instead, Petitioner made the wrong arguments: the special master did not solely rely on *Althen* prongs one and three to find against Petitioner on prong two; the special master's findings were not irrational with respect to the anti-MOG antibody test results—in fact, he agreed with Petitioner; and the special master did not err in requiring Petitioner to present a theory of causation linking his general theory that the HPV vaccine can cause transverse myelitis to his specific case.  For these reasons, the special master's findings under *Althen* prong two are upheld, and Petitioner's motion for review is denied on this point.

### 2.    *Althen* Prong Three

*Althen's* third prong requires a petitioner to provide a "medically-acceptable temporal relationship between the vaccination and the onset of the alleged injury."  *Althen*, 418 F.3d at 1281.  Specifically, a petitioner needs to submit "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact."  *de Bazan*, 539 F.3d at 1352.  In

11

application, the third prong can be broken down into two steps: "(1) establish the timeframe for which it is medically acceptable to infer causation, that is, the timeframe in which symptoms would be expected to arise if the [disorder] was caused by the vaccination, and (2) show that the onset of [the disorder] occurred during this causation period." *See Townsend v. Sec'y of Health & Hum. Servs.*, 170 Fed. Cl. 130, 142 (2024) (alterations in original) (quoting *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011)).

On this issue, Petitioner initially argued that 68 days constituted an acceptable timeframe from which to infer causation-in-fact. *See, e.g.*, ECF No. 27-1 at 15 (arguing that onset was "approximately 9 weeks and 5 days" after vaccination). At this point, the parties had agreed that "transverse myelitis [was] an appropriate diagnosis and that the initial manifestation was on May 30, 2018." First Entitlement Decision at *1 (citations omitted). However, in his first decision, the special master rejected this 68-day timeframe under *Althen* prong three, finding that Petitioner had "failed to show the latency between the vaccination and the onset of his transverse myelitis is compatible with a finding that the vaccination caused the transverse myelitis." *Id.* ("Simply put, an interval of 68 days exceeds the expected amount of time.").

Then, on remand, Petitioner amended his onset theory from 68 days to a range of 7 to 14 days after the "discovery of evidence that [Petitioner] had signs of earlier onset than previously believed." *See, e.g.*, ECF No. 109 at 36; ECF No. 134-8 at 3 ("To summarize this report, in my opinion, by the preponderance of evidence, the events in March and April 2018, beginning 7 to 14 days after his HPV vaccination, were the initial manifestations of his transverse myelitis."). Petitioner argued in the alternative that "onset occurred at 68 days after vaccination, in case the court rejects the evidence for earlier onset." ECF No. 109 at 36; ECF No. 176 at 28 ("Petitioner requests that the Special Master find that . . . [b]oth windows of time, one to two weeks after vaccination, and 68 days after vaccination, are medically acceptable.").

In his second decision denying Petitioner compensation, the special master found the "new" evidence supporting this earlier onset date lacking. *See* Second Entitlement Decision at *19 ("[W]hile [Petitioner] did experience two episodes of urinary incontinence, the evidence does not preponderate in favor of finding that these episodes were manifestations of the transverse myelitis that was manifest on May 30, 2018."). The special master concluded that neither the 7- to 14-day interval nor the 68-day interval satisfied *Althen* prong three and again denied Petitioner compensation. *See id.* at *30, *34.

Now, in his second motion for review, Petitioner does not address the special master's rejection of the earlier onset date. Rather, Petitioner raises only the dismissal of his original 68-day theory and challenges other aspects of the special master's prong three findings. *See generally* ECF No. 185 at 14–20. Under point four of his motion, Petitioner claims that the special master's decision was not in accordance with the law because he had allegedly "require[d] proof that does not exist, instead of proof of a medically acceptable timeframe based on the theory offered." *Id.* at 14. Under point five of his motion, Petitioner accuses the special master of abusing his discretion by "mischaracterizing the Respondent's Expert's testimony on whether 68 days was a medically acceptable timeframe for onset" and relying on this mischaracterization to form his conclusion. *Id.* at 16. As explained below, Petitioner does not meet his burden on either of these assertions.

12

### a.    The special master did not require certainty regarding onset.

Petitioner posits that while the special master "articulated the correct standard" under *Althen* prong three, his "analysis resulted in application of a separate, heightened standard, which was legal error." *Id.* at 14. Petitioner claims that the special master required him to provide "empirical confirmation or other direct proof that the vaccine at issue does cause the injury after 68 days from vaccination" in contravention of the Vaccine Act's purpose. *See id.* at 15 (quoting *Knudsen*, 25 F.3d at 548 ("[T]o require identification and proof of specific biological mechanisms would be inconsistent with the purpose and nature of the vaccine compensation program.")). However, under Petitioner's theory, the special master could not find against Petitioner on *Althen* prong three unless Petitioner presented literally no evidence on the issue. According to Petitioner, any evidence offered—no matter how weak—would suffice, because any weighing of evidence by the special master constitutes requiring "empirical confirmation or other direct proof." *See id.* at 15–16 ("Petitioner, through Dr. Steinman, provided a substantial amount of circumstantial evidence that the Special Master was obligated to consider under the applicable legal standard. The only other proof Petitioner could show would be direct experimental evidence, which does not exist . . . . This is an elevated legal burden and is legal error."). But Petitioner's preferred standard is not the governing standard under *Althen* prong three and, therefore, does not establish that the special master acted contrary to law.

Nor has Petitioner argued that the special master ignored evidence or that his conclusion was arbitrary, capricious, or an abuse of discretion. The special master assessed all the evidence before him on prong three, and he concluded that the medical community has decided that the acceptable window for causation is up to 42 days from vaccination—the outside number for disease onset. Second Entitlement Decision at *34. Now, Petitioner essentially requests that the Court second guess the special master's weighing of the evidence that led to this conclusion.

On this point, the government produced larger studies with many participants presenting a variety of diseases that established the onset window of up to 42 days. *See id.* at *30–32 (weighing the Baxter study, the Pidcock study, the Lazarus/Pilgrim report, and expert testimony regarding studies on Guillain-Barré syndrome). On the other hand, Petitioner offered case reports with a smaller sample size, but closer in disease, that suggested an onset window of up to five months. *See id.* at *32–33 (weighing the Menge paper and the Agmon-Levin article). Petitioner's argument ultimately asks the Court to credit smaller case reports over the larger studies. But reevaluating which body of evidence deserves greater weight is, by definition, a reweighing of the evidence. In his decision, the special master placed the competing authorities on opposite sides of the evidentiary scale. On one side were the case reports relied upon by Petitioner's expert; on the other were larger studies suggesting a different conclusion. After considering both, the special master determined that the larger studies proved more persuasive. *See id.* at *34 ("Dr. Ghosh's opinion, which rests upon epidemiologic studies, is more persuasive than Dr. Steinman's opinion, which rests upon the Menge case report."). That determination reflects precisely the type of evidentiary assessment that factfinders are tasked with making.

Petitioner attempts to frame this issue differently by asserting that the special master "conceded" that four experts—Drs. Menge, Agmon-Levin, Shoenfeld, and Steinman—supported

Petitioner's position.  *See* ECF No. 185 at 16 (citing Second Entitlement Decision at *34).  That characterization is inaccurate.  As an initial matter, the "concession" at issue effectively reflects the views of two experts rather than four, as two of the cited experts simply endorsed the conclusions of the others.  *See* Second Entitlement Decision at *32–33 (discussing articles authored by Drs. Menge and Agmon-Levin; Dr. Shoenfeld was a co-author on Dr. Agmon-Levin's article, and Dr. Steinman merely offered commentary on Dr. Menge's article).  More importantly, the special master did not "concede" the correctness of those views.  Rather, he acknowledged that these experts supported Petitioner's theory and considered their opinions alongside the contrary evidence in the record.

At bottom, nothing in the special master's analysis suggests that he required certainty or imposed a heightened burden of proof.  The special master simply found the larger studies and the testimony relying upon them more persuasive than the smaller case reports relied on by Petitioner's expert.  Petitioner asks the Court to reach a different conclusion from the same body of evidence; however, such a request amounts to nothing more than a reweighing of the evidence, which this Court may not undertake on review.  Without showing that the special master's evaluation of the evidence was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law, the Court cannot find for Petitioner on this point.

### b.      The special master did not mischaracterize testimony.

Finally, Petitioner argues that the special master abused his discretion by "mischaracterizing" the testimony of Dr. Ghosh, the government's expert witness.  *See* ECF No. 185 at 16–18.  In support, Petitioner asserts that the "two neurologists, both treating providers, who testified as experts in this case"—Dr. Steinman for Petitioner and Dr. Ghosh for the government—"both testified that 68 days between vaccination and onset of transverse myelitis was a medically acceptable timeframe for which to infer causation."  *Id.* at 17.

The testimony to which Petitioner refers comes from a brief exchange during the examination of Dr. Ghosh concerning the Agmon-Levin article.  *See* ECF No. 163 at 435:6–437:24.  During that examination, Dr. Ghosh was first asked to provide a summary of the article.  *See id.* at 435:14–24.  Counsel then confirmed with Dr. Ghosh that the article examined individuals who developed transverse myelitis more than six weeks after vaccination.  *See id.* at 436:5–10.  Dr. Ghosh was next read a portion of the article stating: "In most of these cases[,] temporal association was between several days and three months, although a longer time frame of several years was suggested."  *Id.* at 437:13–16.  Counsel then asked Dr. Ghosh whether the statement was "consistent with what [his] understanding is, as well," to which Dr. Ghosh responded, "Yes.  And the only problem with this article is this was over an extended period of time, and what they assume as transverse myelitis, some of these patients may not have truly transverse myelitis."  *Id.* at 437:17–22.

From this single exchange, during which no follow-up questions were asked, Petitioner asks the Court to conclude—inconsistently with the remainder of Dr. Ghosh's testimony—that he agrees with the longer temporal association suggested by Petitioner.  To be sure, Dr. Ghosh stated that the passage from the Agmon-Levin article was "consistent with his understanding."  *Id.* at 437:17–19.  But it is entirely unclear whether Dr. Ghosh is saying it is consistent with his

14

understanding of the Agmon-Levin article or whether it is consistent with Dr. Ghosh's own understanding of acceptable onset.  This one-off and almost entirely ambiguous response cannot support Petitioner's reading when Dr. Ghosh's testimony until that point had reiterated that 68 days exceeds the acceptable window in which to infer causation.  *See, e.g.*, *id.* at 433:17–22; ECF No. 31-1 at 9, 11; ECF No. 53-1 at 3.  Ironically, accepting Petitioner's reading—that Dr. Ghosh completely reversed his position based on this single sentence—would itself mischaracterize the overall substance of Dr. Ghosh's testimony.  If Petitioner truly thought that this exchange with Dr. Ghosh was important to his case, it was incumbent on Petitioner to ask more questions to clear up the ambiguity surrounding the meaning of Dr. Ghosh's response.

In sum, the special master concluded that the medically accepted onset window for transverse myelitis following vaccination is up to 42 days.  Petitioner's challenge amounts to little more than disagreement with that conclusion and a request that the Court reweigh the evidence or reinterpret the government's expert testimony in his favor.  Because Petitioner has not shown that the special master's reasoning was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law, the Court upholds the special master's findings under *Althen* prong three.

## CONCLUSION

To prevail on his motion for review, Petitioner was required to show that the special master's findings under all three *Althen* prongs were arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.  Petitioner failed to meet this burden.  Accordingly, Petitioner's motion for review is **DENIED**, and the decision of the special master is **SUSTAINED.**  In addition, Petitioner's motion for interim attorneys' fees and costs, ECF No. 189, is **REMANDED** to the special master.  The Clerk shall enter **JUDGMENT** accordingly.

**IT IS SO ORDERED**.

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge